IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>BOBBYE TOLLIVER, )<br>)<br>)<br>Defendant. ) | Case: 1:21−mj−00492<br>Assigned To : Meriweather, Robin M.<br>Assign. Date : 6/23/2021<br>Description: Complaint w/ Arrest Warrant |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT**

  I, Joshua Rothman, a Special Agent with the Federal Bureau of Investigation being duly sworn, depose and state as follows:

  1. I have been a Special Agent with the FBI for the past thirteen years, and have been stationed at the Washington, D.C. field office that entire time. I am currently assigned to the FBI Safe Streets Task Force. In that role, I am principally involved in narcotics and narcotics-related investigations, including violent offenses related to narcotics investigations. Since 2008, I have received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, white-collar crimes, search warrant applications, and various other crimes.

  2. Since January 2015, I have been assigned to investigate federal narcotics crimes on the FBI Washington, D.C. Safe Streets Task Force, a violent crime and gang task force. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, I have been involved in the

1

use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short-term and long-term narcotics and homicide investigations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; conducting court-authorized Title III wiretap investigations; and preparing and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband.

3. Through my training and experience, as described above, I have become familiar with the provisions of the federal firearms laws administered under Title 18 and Title 26 of the United States Code, as well as controlled substance laws administered under Title 21 of the United States Code. I have personally conducted and participated in investigations that have resulted in the arrest and conviction of numerous individuals responsible for violations of the District of Columbia Code and United States Code including, but not limited to, narcotics and firearms offenses.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all my knowledge, or the knowledge of others, about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of Title 21 U.S.C. § 841(a), 18 U.S.C. § 922(a)(4), 18 U.S.C. § 922(o), and 18 U.S.C. § 924(c)(1)(B)(ii) have been committed by **BOBBYE TOLLIVER ("TOLLIVER")**.

**PROBABLE CAUSE**

6. On April 17, 2019, at approximately 2:03 a.m., Officers with the Metropolitan Police Department ("MPD") conducted a traffic stop on a Hyundai vehicle bearing D.C. registration NAT1632 in the 4000 block of 9th Street, Southeast ("SE") because its headlights were not activated. Inside of the vehicle was the driver, T.S., and Diante Arik Wiley ("Wiley"). A WALES/NCIC search of the D.C. license plate revealed that T.S. was the registered owner of the vehicle.

7. Officers obtained T.S.' permission to search her vehicle. During the vehicle search, law enforcement located a cardboard box in the trunk stamped with "OUTDOORSPORTSUSA.COM." Affixed to the box was a UPS 2nd Day Air shipping label addressed to Wiley. The following items were located inside the cardboard box: 1 round of .223 ammunition, 1 AR15 platform lower parts kit, 1 9mm magazine, 1 rifle stock, 1 pistol grip, as well as additional miscellaneous firearm building parts.

8. Once the above-mentioned items were recovered, Wiley spontaneously claimed ownership of the box and ammunition, and stated that he was building a rifle in Maryland. A WALES/NCIC search of Wiley resulted in negative results for any registration of ammunition, firearms, rifles, or the license to carry such items. Wiley was placed under arrest for possession of unregistered ammunition. Officers confirmed through MPD databases that Wiley did not have any type of registration or license for firearms or ammunition in the District of Columbia.

9. Since then, law enforcement, including your affiant, has continued to investigate Wiley regarding his involvement with firearms manufacturing, possession, and trafficking in the District of Columbia. Law enforcement has executed several subpoenas and search warrants for

Wiley's social media accounts, email accounts, financial records, and purchase history from firearms parts distributors.

10. On April 9, 2021, law enforcement set up a controlled purchase from Wiley for narcotics and a fully automatic machinegun, where a source would purchase the narcotics and firearm and would be observed by law enforcement.

11. Immediately prior to the controlled purchase on April 9, 2021, law enforcement members observed **TOLLIVER** get into the front passenger seat of Wiley's vehicle, a silver Infiniti M45 bearing Maryland registration 8BV5906, near 24 Staton Drive, Upper Marlboro, Maryland. They further observed as Wiley drove himself and **TOLLIVER** from that location to the parking lot of 1523 Alabama Avenue Southeast, Washington, D.C., where the controlled purchase took place. During the controlled purchase, **TOLLIVER** acted as a go-between, transporting the machinegun and marijuana from Wiley to the Source, and transporting United States currency from the Source to Wiley.

12. Following the controlled purchase, at approximately 8:18 p.m., officers stopped and arrested Diante Wiley based on the sales of the firearms and drugs. Wiley was subsequently charged in a criminal complaint with unlawful possession and transfer of a machinegun, in violation of 18 U.S.C. § 922(o), and using/carrying/possessing a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(B)(ii).[1] At the time of the stop, **TOLLIVER** was in the passenger seat of Wiley's car, consistent with observations during the controlled purchase.

13. A stop of the source's vehicle resulted in the recovery of marijuana and a firearm. The marijuana was in a sealed, commercial package from Proper Dispensary in Los Angeles,

---

[1] *United States v. Wiley*, Crim No. 21-CR-300 (ABJ) (D.D.C.).

California. Specifically, the package was labeled "Jungle Boys Kush Mints" and noted that it contained 3.5 grams of marijuana containing 33.40% Tetrahydrocannabinol (THC), the active ingredient in marijuana.

14. The firearm purchased during the controlled purchase was determined to be a black in color .223 caliber M-16 type Privately Manufactured Firearm (PMF) with no serial number. The firearm was a visual match for firearms posted for sale on Wiley's Instagram account. Upon initial inspection of the firearm, there was a visible automatic sear pin hole located above the selector switch. Agents conducted a field test for fully automatic capability on scene which yielded positive results.[2] The firearm was later examined by the ATF laboratory, and determined to be a machinegun regulated under Title 26 U.S.C. § 5845 the National Firearms Act (NFA).

15. **TOLLIVER** was transported to the FBI Washington, D.C. Field Office where he was advised of his Miranda rights. **TOLLIVER** stated that he understood his Miranda rights, and agreed to speak with special agents. **TOLLIVER** explained that Wiley was his neighbor in that Wiley stated with his grandmother, who lived next door to **TOLLIVER's** mother. **TOLLIVER** stated that he was merely getting a ride with Wiley from Upper Marlboro, Maryland, to Washington, D.C., and that he did not know anything about any transaction involving marijuana or firearms. **TOLLIVER** explained that he was simply in the wrong place at the wrong time.

16. Wiley was also interviewed after his arrest. Among other things, Wiley admitted purchasing a Glock 17 with a "switch" from **TOLLIVER**. Based on my training and experience,

---

[2] A field test for fully automatic capability involves the following: with the magazine and all ammunition removed from the firearm, the bolt or slide is pulled to the rear to release. The tester will then pull the trigger and keep it depressed then pull the bolt or slide to the rear again. The trigger is then released and pulled again. If the firing mechanism (hammer) does not fall when the trigger is pulled for the second time, this is consistent with the firearm operating in the fully automatic mode.

I know that "switch" is a common slang term for an illegal device that enables a conventional, semi-automatic pistol to function as a fully automatic firearm. A "switch" also meets the definition of "machinegun" under federal law. Given the differences between Wiley's statements and **TOLLIVER**'s statements, specifically Wiley's statement that he and **TOLLIVER** had engaged in illegal machine gun transfers prior to the controlled purchase on April 9, 2021, special agents began investigating a possible link between **TOLLIVER** and Wiley for the manufacture and sale of fully automatic firearms.

### Search of Wiley's Cellphone

17. During his post-arrest interview, Wiley provided written consent for special agents to search the contents of the cell phone seized from him incident to his arrest. At the time that Wiley provided written consent, law enforcement had already obtained a federal search warrant (21-SW-107), which also authorized the search of the cell phone. While reviewing the contents of the phone, law enforcement observed a conversation between Wiley and an individual identified in Wiley's phone as "Tay," during which Wiley referenced **TOLLIVER** and firearms. These messages appear to corroborate Wiley's statement during his post arrest interview that he had purchased from **TOLLIVER** a Glock 17 with a "switch." Specifically, on or about December 21, 2020, at approximately 2:37 a.m. (UTC), Wiley was communicating with "Tay" in order to broker a sale of three "switches" that were being sold by **TOLLIVER** — including a Glock 17 with a "switch," as admitted by Wiley in his post-arrest interview. Wiley asked, "3 switches tho 1500"; "Lol I'm cool tho u my man so Iont care we both eat." Tay answered, "Lls look at you and Ite bet we just wait omg on your man." Wiley responded, "Just waiting on call from bruh lemme know he leaving stu so we can weed him" and "Meet."

18. Wiley later sent "Tay" the below screen shot of a private Instagram message between Wiley and **TOLLIVER** via **TOLLIVER**'s Instagram account, "1realmoneyroute."



19. In this screen shot, as displayed above, **TOLLIVER** messaged Wiley, "I thought u was saying 2 & my 17, that's basically 3 & my 17." After sending this screenshot, Wiley messaged "Tay" to more clearly explain the conversation with **TOLLIVER**, stating: "He [**TOLLIVER**] saying give him 200 on top for a extra one." "Tay" replied, "I got 125," to which Wiley responded, "I'll put the rest to it." Approximately 30 minutes later, "Tay" messaged Wiley, "Bout to pull up." Shortly thereafter, Wiley messaged "Tay" the following, "$PDSBINO100."

7

20. Based on my training and experience, I understand that, in the above conversation, Wiley was brokering the deal of three switches from **TOLLIVER** to "Tay" for $1,500 ("3 switches tho 1500"). The screen shot shared by Wiley with "Tay" confirms that Wiley was arranging the sale of two switches and a Glock 17 with a switch from **TOLLIVER**, and that **TOLLIVER** did not think he was making enough money on the deal ("I thought u was saying 2 & my 17, that's basically 3 & my 17"). Wiley informed "Tay" that **TOLLIVER** needed an additional $200 ("He saying give him 200 on top for a extra one"). When "Tay" told Wiley that he did not have an additional $200 ("I got 125"), Wiley agreed to pay the difference ("I'll put the rest to it") because Wiley was also going to make money from brokering the deal.

21. Based on my training and experience, I believe that this transaction was completed, and that Wiley brokered a sale of 3 switches to "Tay" from **TOLLIVER**. This is based on a number of factors, including Wiley texting "Tay" "He just sent addy wya" ("wya" is a common street abbreviation for "where you at") and later sending "Tay" his username for some form of online payment ("$PDSBINO100"). This is also based on Wiley's admission of purchasing a Glock 17 with a "switch" from **TOLLIVER** during his post-arrest interview before any of this evidence from Wiley's cell phone was known to me. It should further be noted that during the same timeframe as this conversation via Instagram, there were multiple telephone calls made between Wiley and "Tay" indicating that parts of their conversation were conducted through means other than direct or text messaging.

22. In addition, law enforcement located in Wiley's phone conversations pertaining to narcotics and firearms with phone number 202-████. T-Mobile subscriber records reflect that **TOLLIVER** was the subscriber for telephone number 202-████ from November 28, 2020 to May 5, 2021, the date of the subpoena return. On or about March 15, 2021 there was a conversation

between Wiley and the user of 202-▇▇▇▇ (i.e **TOLLIVER**) about the purchase of Promethazine, a Schedule V controlled substance. During the conversation, Wiley informed **TOLLIVER** that the Promethazine was obtained from a female who had a prescription stating, "str8 out pharm." Later in the conversation, **TOLLIVER** asked how much Wiley would charge him for some of the Promethazine, "Wat you gon tax me for a 4 , fwm bra this shit for all week lmao." Wiley responded, "I gotta do 7 bro I paid 150 atwu." After further talking price, **TOLLIVER** offered to buy two bottles for 300, "Give me 2 for 300 brah" to which Wiley replied, "325 bro I gotta make sumn I wouldn't even have grabbed foreal." The two continued to negotiate possible pricing, but the conversation ended prior to any agreement because Wiley arrived in person to pick up **TOLLIVER** stating, "Brickyard station dr u gon see me."

23.  On or about April 4, 2021, at approximately 7:05 p.m. (UTC) **TOLLIVER** messaged Wiley," I got za 60." In response, Wiley stated, "Loaded rn." I believe based on my investigation of narcotics cases, and the evidence obtained in this particular investigation to date, that in this conversation **TOLLIVER** was informing Wiley that he had marijuana ("za" is a common slang term for marijuana) for sale for $60. However, Wiley did not need any because he already had some ("Loaded rn [right now]"). Two days later, on or about April 6, 2021, at approximately 10:29 p.m. (UTC) **TOLLIVER** messaged Wiley, "Find some OG." Wiley responded, "Lil bro broke mic" and sent a photograph of what appeared to be marijuana based on my training an experience, followed by, "Looks good I ain't smoked it tho." **TOLLIVER** then replied, "Na don't look like g tho smh."

24.  Based on all the above, it is my understanding that **TOLLIVER** was not only buying firearms from Wiley, but also engaged in the sale of narcotics and firearms to include fully automatic firearms which are regulated under the National Firearms Act.

25. Based on the foregoing, your affiant asserts that there is probable cause to conclude that, on or about April 9, 2021, in the District of Columbia, **BOBBYE TOLLIVER** violated 18 U.S.C. §§ 922(a)(4), and 2, which makes it a crime to transport a machinegun in interstate commerce without a license.

26. Based on the foregoing, your affiant asserts that there is probable cause to conclude that, on or about April 9, 2021, in the District of Columbia, **BOBBYE TOLLIVER** violated 18 U.S.C. §§ 922(o), and 2, which makes it a crime to transfer or possess a machinegun.

27. Based on the foregoing, your affiant asserts that there is probable cause to conclude that, on or about April 9, 2021, in the District of Columbia, **BOBBYE TOLLIVER** violated 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, which makes it a crime to distribute, or possess with the intent to distribute, a mixture and substance containing a detectable amount of marijuana.

28. Based on the foregoing, your affiant asserts that there is probable cause to conclude that, on or about April 9, 2021, in the District of Columbia, **BOBBYE TOLLIVER** violated 18 U.S.C. §§ 924(c)(1)(B)(ii), and 2, which makes it a crime to uses or carries a machinegun during and in relation to, or possesses a machinegun in furtherance of, a drug trafficking crime for which the person can be prosecuted in federal court, to wit: distribution, or possession with the intent to distribute, a mixture and substance containing a detectable amount of marijuana.

_____
Special Agent Joshua Rothman
Federal Bureau of Investigation

Subscribed and sworn by telephone pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on June 23, 2021.

_____
HON. ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE